1  BARRY J. PORTMAN
   Federal Public Defender
2  CYNTHIA C. LIE
   Assistant Federal Public Defender
3  160 West Santa Clara Street, Suite 575
   San Jose, CA  95113
4  Telephone:  (408) 291-7753

5  Counsel for Defendant CHANG

6

7
                IN THE UNITED STATES DISTRICT COURT
8
              FOR THE NORTHERN DISTRICT OF CALIFORNIA
9

10 UNITED STATES OF AMERICA,          )    No. CR-07-00554 JF
                                      )
11              Plaintiff,            )    DEFENDANT'S SENTENCING
                                      )    MEMORANDUM
12 vs.                                )
                                      )
13 DOMINIC CHANG,                     )
                                      )
14              Defendant.            )
   _____)

15
                          **INTRODUCTION**
16
       Defendant Dominic Chang concurs with the Guideline range determined by the United
17
   States Probation Office and its recommendation of a probationary sentence.  Mr. Chang
18
   respectfully submits that such a sentence would be sufficient and no greater than necessary to
19
   achieve the sentencing objectives identified by Congress in the Sentencing Reform Act,
20
   particularly in view of his long history of service to the community, the unusual combination of
21
   circumstances that led to the otherwise highly uncharacteristic offense conduct, and his post-
22
   offense efforts to rehabilitate himself and to make amends for his crime.
23
                           **BACKGROUND**
24
       In 1949, when Dominic Chang was less than three years old, his then-prosperous family
25
   was compelled to flee Shanghai for Hong Kong as the Communist army of Mao Zedong
26

surrounded the city then controlled by Chiang Kai-Shek's nationalist forces.  PSR 36; Exh. B.
As refugees in a territory where Cantonese and English were the languages of commerce and
government, the Chang family found that its former status in a Mandarin-speaking city meant
nothing to the family's current prospects.  Mr. Chang's father, a banker in Shanghai, was
consistently unable to secure employment in Hong Kong, and ultimately left the family to reside
in Thailand for much of Mr. Chang's youth and early adulthood.  Exh. B.  Mr. Chang, as the
oldest son, became primarily responsible for the family's financial support, and ultimately left
school after the 6th grade in order to find full-time work and thereby fund the education of his
siblings.  Exh. B.

In an extended period of apprenticeship, Mr. Chang learned the trade of a ship's engineer,
eventually rising to the rank of 2nd engineer on 100,000 ton cargo liners.  In his early 20s, Mr.
Chang met Lucia Wu, a young woman from a very traditional Chinese family with ambitions to
study and live abroad.  Mr. Chang reordered his career around Ms. Wu's educational journey,
selecting shipping contracts that would bring him to the ports closest to her schooling, in
Vancouver and then in Tokyo.  After her education, the couple married, and although Ms. Wu
endeavored for two years to adapt to life on board a cargo liner, she ultimately prevailed upon
Mr. Chang to leave his position and his family to start a new life in the United States: "[An]
engineer makes a good income, but it is not suitable for raising a family to have a father away at
sea so long.  I lived with Dominic on the ship for two whole contracts, because his position
allow[s] him to bring a wife on the ship. Each contract is at least a year. It was very boring living
there. And who wants to raise kids on a cargo liner? So we decided to move to the U.S. to have a
better life."  Exh. B.

In the U.S., however, Mr. Chang struggled to master English, while his more
cosmopolitan and better educated wife thrived here.  Ms. Wu recalls, "For a long time, he was
just a mechanic's helper at a gas station. This is very low class compared to being engineer of a
big ship.  Lots of times, he said he wanted to go back.  He thought it would be better back in

Hong Kong. I knew that engineers spend too much time away from home, so I refused." Exh. B.

In 1982, the couple took advantage of an opportunity to take over an abandoned Chevron station.

While this foray into small business ownership enabled them to prosper financially, the pressures

and frustrations of running the business opened a rift in the marriage. As Ms. Wu recalls:

> There was a lot of pressure from everywhere, Chevron, the customers and the vendors.
> His English was bad, and his education in Hong Kong was not very long, so he failed all
> the tests that Chevron makes him take to be sure that he could manage the business. I
> passed them all, so he had to depend on me as a business partner. We could not run a gas
> station unless one of us passed the tests and got the certificate. It was hard for him to
> accept failing all those tests. And it happened all over again years later when we started a
> different gas station for Unocal. I passed the tests and he did not. It was especially hard
> for him to be failing these tests when one of the brothers he had put through school was
> now a very successful jewelry store owner in Singapore. In Chinese families, this is not
> the way it is supposed to happen. It is embarrassing to have both your wife and your
> younger brother do better than you. He knew it was only because of me that the gasoline
> company let him sell their gas. We started having problems with our marriage. He was
> very conservative, and I was more open-minded and made an effort to learn about this
> country.

*Id.* It was at this point that Mr. Chang began gambling:

> He started to go to casinos a lot. When he went to a casino, the people who worked there
> always treated him like a VIP. The last time he was really a VIP anywhere was when he
> was working on the ship as an engineer. Also, because he is a very generous person, he
> always gives away big tips, and that made the casino workers pay attention even more.
> Mr. Chang, it is so nice to see you, Mr. Chang, please let me get you a drink. That sort of
> thing. He likes to be with people, and in the casinos, they made him feel like he was
> important and had lots of friends, after long hard work and pressure at the gas station.

*Id.* For the sake of their children and to avoid the traditional Asian stigma associated with

divorce, the couple remained together for years, despite Ms. Wu's growing unhappiness and

eventual infidelity and Mr. Chang's difficulty acknowledging the emotional problems that were

driving his gambling and widening the rift with his wife. *Id.*

Their divorce exacerbated the problem. Mr. Chang was emotionally and financially

devastated by Ms. Wu's departure. Bor Chan writes: "I can feel the pain when he told me that

his wife was leaving him because she cannot stand his dirty hands. But what hurt him the most

was the suffering that he felt the divorce was causing to their children." Exh. D. Ms. Wu

observed that "his gambling was even worse after the divorce, because I know he lost houses he

1  bought when we were married. He does not know how to handle his feelings. He does not know

2  how to be alone, he has to be around people all the time, so I think he went to the casinos more

3  and more." *Id.* Jonathan Chang likewise reports: "[M]y father's life consisted of work and

4  family; however, when his relationship with my mother became strained, gambling became part

5  of his life as a way, I believe, to avoid my mother and their relationship issues." Exh. A. At the

6  same time, never having mastered English and management skills required by oil companies for

7  their gas station owners, Mr. Chang was left with the challenge of building a new free-standing

8  auto shop, without the benefit of the central location and crossover business that he had enjoyed

9  in his previous two ventures with Ms. Wu. He also made significant concessions in his financial

10  settlement with Ms. Wu. Exh. E. As a result, Jonathan Chang observes:

11      [M]y father developed a chip on his shoulder – he felt like he had to prove that he could

12  do just as well, financially and in other respects, as he had during their marriage, and do
    better than my mother after the divorce. He wasn't obsessed with money per se, but he

13  became preoccupied with what he saw as the inequities of life and class, and he began to
    equate money with happiness. He would have wanted to pay for the college education of

14  my sister and myself in any case, but it became especially important for him to do it after
    the divorce, both as a way of meeting what he saw as his parental duty, as well as to give

15  us the education that he was convinced would allow us to escape the difficulties that he'd
    faced along his way.

16  Exh. A. Jonathan Chang began college in 1999, the same year that Mr. Chang began depositing

17  business revenues into the Wells Fargo bank account that he kept from his bookkeeper; Jennifer

18  Chang began college two years later in 2001. Exh. B. When Jonathan Chang began applying to

19  law schools in 2002, Mr. Chang pressed his son to accept continued financial assistance: "Seeing

20  how he was living and knowing that he was still putting my sister through school, I couldn't

21  accept. I could see in his face that he was both relived by my refusal and ashamed of his relief."

22  Exh. A.

23      The combination of Mr. Chang's intensified gambling and his determination to maintain

24  appearances after the divorce gradually stripped him of his home, his most valued personal

25  possessions, and ultimately his theretofore scrupulous adherence to the law.

26

**ARGUMENT**

Dominic Chang is a 61-year-old with no prior criminal history, who until the events following from his divorce in 1997 had not once but twice succeeded in rebuilding a promising life for himself and his family.  With poor health and little job history other than his decades of self-employment, Mr. Chang is ill-equipped to rebuild a life for himself a third time following a sentence of imprisonment.  More importantly, such a sentence would be of greater severity than his offense and the contributing circumstances call for.  This Court has ample discretion to sentence Mr. Chang to probation, to punish Mr. Chang no further than necessary to assure his conformity to the law after his uncharacteristic deviation from it in the instant case, to permit his continued recovery from his gambling addiction with the assistance of the mental health resources of the Probation Office, and to enable him to help maintain the small shop that he established together after his divorce from Ms. Wu.

**I.    The Supreme Court has Made Clear that District Courts Have Both the Authority and the Responsibility to Exercise Their Judgment and Discretion in Determining the Appropriate Sentence**

The Supreme Court's decisions in *United States v. Booker*, 543 U.S. 220 (2005), *Kimbrough v. United States*, 128 S.Ct. 558 (2007), and *Gall v. United States*, 128 S.Ct. 586 (2007), have dramatically altered the district court's role in sentencing.  Taken together, these cases make clear that district court judges now have the ability, as well as the duty, to exercise their independent judgment in arriving at a sentence that is "sufficient, but not greater than necessary," to achieve the goals outlined in 18 U.S.C. § 3553 as applied to a particular offender and offense.  Before the Supreme Court's decision in *Booker* rendered the Sentencing Guidelines advisory, district courts did have some authority to depart from the Guidelines.  *See generally* U.S.S.G. § 5K (enumerating grounds for departure).  But this authority was far from absolute. Certain factors were forbidden as grounds for departures, see U.S.S.G. § 5K2.0(d); others were strongly discouraged, *see e.g.*, U.S.S.G. § 5K2.0(a)(4).

1    In *Booker*, the Supreme Court held that the mandatory nature of the Sentencing Reform

2   Act of 1984 violated the Sixth Amendment right to a jury trial. *See Booker*, 125 S.Ct. at 756.

3   "To remedy the constitutional infirmity, the Court severed the mandatory portions of the Act,

4   rendering its sentencing provisions, including the Sentencing Guidelines, effectively advisory."

5   *United States v. Ameline*, 409 F.3d 1073, 1074 (9th Cir. 2005) (*en banc*). The Guidelines,

6   "formerly mandatory, now serve as one factor among several courts must consider in determining

7   an appropriate sentence." *Kimbrough*, 128 S.Ct. at 564. While "district courts still 'must consult

8   [the] Guidelines and take them into account when sentencing,'" *United States v. Cantrell*, 433

9   F.3d 1269, 1279 (9th Cir. 2006) (quoting *Booker*, 125 S.Ct. at 767), the district courts "may not

10  presume that the Guidelines range is reasonable," *Gall*, 128 S.Ct. at 596-97 (citing *Rita v. United*

11  *States*, 127 S.Ct. 2456 (2007)). And, as the Court's subsequent decisions in *Gall* and *Kimbrough*

12  demonstrate, *Booker*'s consultation requirement is not intended to limit the district court's

13  sentencing discretion.

14    In *Gall*, the Supreme Court held that appellate courts cannot impose a requirement that "a

15  sentence that constitutes a substantial variance from the Guidelines be justified by extraordinary

16  circumstances." *Gall*, 128 S.Ct. at 591. The Court likewise rejected "the use of a rigid

17  mathematical formula that uses the percentage of a departure as the standard for determining the

18  strength of the justifications required for a specific sentence," *id.* at 595, and held that it is within

19  the district court's discretion to arrive at an appropriate sentence, "whether inside, just outside, or

20  significantly outside the Guidelines range," *id.* at 591. The Court explained:

21       [B]oth the exceptional circumstances requirement and the rigid mathematical formulation
         reflect a practice – common among courts that have adopted "proportional review" – of
22       applying a heightened standard of review to sentences outside the Guidelines range. This
         is inconsistent with the rule that the abuse-of-discretion standard of review applies to
23       appellate review of all sentencing decisions – whether inside or outside the Guidelines
         range.
24
    *Id.* at 596. In *Gall*, the district court had rejected a Guidelines range of 30 to 37 months in favor
25
    of probation. The Supreme Court acknowledged that "[i]f the Guidelines were still mandatory,
26

1    and assuming the facts did not justify a Guidelines-based downward departure, this would

2    provide a sufficient basis for setting aside Gall's sentence because the Guidelines state that

3    probation alone is not an appropriate sentence for comparable offenses." *Gall*, 128 S.Ct. at

4    601-02.  But, the Court went on to explain, "the Guidelines are not mandatory, and thus the

5    'range of choice dictated by the facts of the case' is significantly broadened." *Id.* at 602.  The

6    sentence of probation was upheld.

7         In *Kimbrough*, the Supreme Court upheld the district court's decision to depart downward

8    in recognition of the sentencing disparity between crack cocaine and powder cocaine offenses

9    under the Guidelines strictly applied.  The Court held that it is permissible for sentencing courts

10   to impose a sentence outside of the Guidelines even when the decision to do so is "based solely

11   on policy considerations, including disagreements with the Guidelines." *United States v. Baird*,

12   – F. Supp. 2d –, 2008 WL 151258 (D. Neb. Jan. 11, 2008) at *2 (citing *Kimbrough*, 128 S.Ct. at

13   570).

14        Despite the "continuing duty of district courts to consult the Guidelines," *Cantrell*, 433

15   F.3d at 1279, the Supreme Court has emphasized that a district court "may not presume that the

16   Guidelines range is reasonable." *Gall*, 128 S.Ct. at 597.  "Rather, after accurately calculating the

17   advisory range, so that it 'can derive whatever insight the guidelines have to offer, [a district

18   court] must sentence based on 18 U.S.C. § 3553(a) without any thumb on the scale favoring a

19   guideline sentence." *United States v. Villanueva*, – F. Supp. 2d –, 2007 WL 4410378 (Dec. 14,

20   2007 E.D. Wis.) at *1 (quoting *United States v. Sachsenmaier*, 491 F.3d 680, 685 (7th Cir.

21   2007)). And, as the Court indicated in *Kimbrough*, what insight the guidelines have to offer may

22   be considerably less compelling where the applicable Guideline was based not upon empirical

23   study but upon purely political judgments. See *Kimbrough*, 128 S.Ct. at 574-75.  The current

24   version of U.S.S.G. § 2T4.1, notably, shows no evidence of empirical underpinnings, but rather

25   has fluctuated over time in accordance with "comments received from the Department of Justice,

26   the Criminal law Committee of the Judicial Conference, and others, that the offenses sentenced

1  under the guidelines consolidated by this amendment under-punish individuals involved with

2  moderate and high loss amounts."  U.S.S.G. App. C, Amend. 617 (2001).

3        The Court's exercise of its broadened discretion is also to be accorded deference on

4  appeal, in sharp contrast to Congress' pre-*Booker* institution of a *de novo* standard of review for

5  downward departures.  *Gall*, 128 S.Ct. at 597-98; *Cf.* 18 U.S.C § 3742(e) (2003 ed. & Supp. IV).

6  Furthermore, if the Court concludes that a sentence within the 12-18 month Guideline range is

7  warranted in the present case, imprisonment for the term selected is no longer mandatory.

8  Although the Guidelines provide that a sentence within Zone D of the Sentencing Table is to be

9  satisfied by a term of imprisonment, *see* U.S.S.G. §5C1.1(f), this provision too is subject to the

10  reasonableness inquiry of the Sentencing Reform Act.  "Under *Booker*, the Guidelines'

11  disallowance of the option of probation is, of course, merely advisory."  *United States v.*

12  *Kononchuk*, 485 F.3d 199, 205 n. 4 (3d Cir. 2007).

13  **II.**  **The Factors Enumerated in § 3553(a) Support a Sentence Below the Advisory**
   **Guidelines Range**

14
15        Section 3553(a) provides that "[t]he court shall impose a sentence sufficient, but not

16  greater than necessary," to achieve the goals of sentencing. 18 U.S.C. § 3553(a).  To arrive at

17  such a sentence, the court is directed to consider the following factors: (1) the nature and

18  circumstances of the offense and the history and characteristics of the defendant; (2) the need for

19  the sentence imposed to reflect the seriousness of the crime, promote respect for the law, provide

20  just punishment, afford adequate deterrence, protect the public, and provide the defendant with

21  education, training, and medical care; (3) the kinds of sentences available; (4) the applicable

22  Sentencing Guidelines, including any relevant policy statements; (5) the need to avoid

23  unwarranted sentence disparities; and (6) the need to provide restitution to any victims of the

24  offense. *See id.*

25        A sentence of probation and a term of home confinement would provide sufficient

26  punishment without exceeding that necessary to achieve all of the other objectives that Section

1    3553 was intended to further.  As the sentencing court in *Gall* observed, "probation, rather than

2    'an act of leniency,' is a 'substantial restriction of freedom.'" *Gall*, 128 S.Ct. at 593.  The district

3    court went on to explain:

4        [The defendant] will have to comply with strict reporting conditions . . . . He will not be
         able to change or make decisions about significant circumstances in his life, such as
5        where to live or work, which are prized liberty interests, without first seeking
         authorization from his Probation Officer or, perhaps, even the Court. Of course, the
6        Defendant always faces the harsh consequences that await if he violates the conditions of
         his probationary term.

7
8    *Id.*  The Supreme Court concurred, noting that probationers are "subject to several standard

9    conditions that substantially restrict their liberty."  *Id.* at 595.  These substantial constraints will

10   be even more acutely felt by Mr. Chang, given the disgrace this prosecution has visited upon him

11   within the local Chinese-American community and among his customer base, and the strain on

12   his existing relationships.  Exh. B.  Even just to live with his family and yet be unable to join

13   them on any non-essential outing for as much as a year, even when his children return to visit

14   from the East coast, or when friends or family visit from Hong Kong, will be a constant reminder

15   of his both his transgression and the stigma to which his Chinese culture makes him particularly

16   sensitive.  Similarly, the requirement of mental health treatment, while necessary to assist him in

17   addressing his gambling addiction and the emotional issues that contribute to that addiction, will

18   operate not only as a considerable restriction on his freedom but also as a significant incursion on

19   his subjective privacy and dignity interests.

20       Moreover, as Ms. Wu and Jonathan Chang point out, Mr. Chang appears to have

21   experienced more than the typical degree of suffering attendant on a criminal prosecution.  Ms.

22   Wu notes that "in Chinese culture, saving face is [equally] important as saving life.  To a Chinese

23   man, losing face is worse than losing life."  She also alludes to the notoriety that publication of

24   USAO press releases in Chinese-language media have created for Mr. Chang, as well as his years

25   in fear of the outcome of the audit and investigation. Exh. B.  Jonathan Chang writes of his

26   father's "breakdown" at or near the time he began meeting with the case agent.  He also reports,

1   "as a result of these events, [Thanh Lam] is frequently awakened by [Mr. Chang] sobbing in the

2   middle of the night.  Until this case, I had known my father to have cried twice in his adult life:

3   first, when he sat me and my sister down to tell us that he and my mother were getting a divorce,

4   and then at the funeral of his nephew, who died of cancer at the age of 21."  Exh. A.

5        Section 3553(a) also makes clear that punishment is not the only goal of sentencing, or

6   even the most important one.  *See United States v. Carty*, – F.3d –, 2008 WL 763770 (9th Cir.

7   Mar. 24, 2008) (en banc) at *4 (no single factor identified in § 3553(a) is entitled to greater

8   weight than any other).  Equally important is the need to consider what sort of sentence will best

9   assure that Mr. Chang's resumption of  law-abiding, productive citizenship will continue

10  unimpeded.  In assessing the risk of recidivism, this Court can and should consider evidence of

11  his otherwise exemplary good character and the extent to which the offense conduct represented

12  a significant deviation from Mr. Chang's habitual path.

13       Mr. Chang's obedience to the law prior to the instant offense was such that, during his

14  interview with the probation officer, he could recall without hesitation the date of his sole prior

15  traffic infraction, a speeding ticket in 1986.  What is clear from the accounts of his customers,

16  family and friends is that Mr. Chang, despite his illegal acts with respect to the 1999-2002 tax

17  years, exhibits the character of one whose lack of criminal history reflects core values rather than

18  merely a fear of legal process.  Bessie Pan writes:

19       He is always ready with a helping hand, with old friends or new acquaintances alike. On
         countless occasions he has given his help wholeheartedly, never expecting anything in
20       return. I recall several of these instances.

21       One was a restaurant worker that Dominic had met—this man works at the restaurant that
         Dominic frequents—not a close friend at all. The worker spoke no English, and had no
22       relatives here, so when he fell sick Dominic took him to the hospital to see the doctor.
         Another time was when Dominic received a phone call from a friend's sister in Hong
23       Kong, saying that her sister who has a mental condition, is missing. Dominic then
         searched and eventually found the missing woman, and took her to the mental hospital for
24       treatment. She was in and out of the hospital several times, while Dominic tried to take
         care of her. Finally she had to return to China because of her condition, and Dominic took
25       her to the airport himself, paying for the airfare.

26

1    There was still another case where a restaurant dishwasher had a persistent cough and was
     mistakenly diagnosed as having cancer. Consequently he needed a lost of tests, and
2    Dominic would take him to the hospital for these tests, standing in line, and helping him
     (with English) with forms and hospital procedures.
3
Exh. C.
4
     Jonathan Chang likewise cites numerous such examples:
5
     He has also housed numerous relatives, friends and friends of friends at his home as they
6    find their footing in the United States.  In 1989, my father's close friend from their
     [engineering] apprenticeship, Antonio, moved from Hong Kong to the Bay Area; not only
7    did my father provide Antonio with housing and food for nearly a year as he waited for
     the rest of his family to join him, my father also gave him a job at his gas station.  When
8    Antonio's family arrived, my father helped Antonio's wife secure a job.  This pattern
     occurred several times in my childhood and has not ceased.  This past December, he was
9    hosting a husband and wife from China who had recently obtained asylum; I asked how
     my father met the couple, and the answer was that they had met at a restaurant where the
10   wife was working as a waitress.  In addition to welcoming the two into his household, my
     father helped them learn to drive and enlisted me to help petition for the entry of their
11   young child and elderly father.

12   Exh. A.  This latest instance is particularly illustrative, in that Mr. Chang rendered these services

13   at a time when he was preparing to plead guilty to the captioned indictment and enduring what

14   his family describes as particularly  intense anxiety and emotional strain.

15       Ms. Wu further notes that Mr. Chang's generosity has extended to customers he believed

16   might be unable to afford his services:

17       He would fix people's cars for free if it looked like they couldn't afford to pay, even if he
         didn't know them. They didn't even have to ask! This happened a lot, even if he knew
18       they had a job. I remember once a pastor came to have his car fixed and Dominic didn't
         charge him anything. "You're not even a Christian!" I said to Dominic. He said pastors do
19       not make a lot of money. He never attend his Sunday service nor attempt to. He is just
         good in nature and try to provide anything for anyone.
20
Exh. B.  Nor is his good will or good faith limited to customers from his own immigrant
21
community.  Customer Deborah McGee-Dillard, who considers Mr. Chang her "brother from
22
another mother," calls Mr. Chang "one of the most honest men" that she and her husband know
23
and offers to attest to his integrity under oath.  Exh. F.
24
         Ms. Wu speaks highly of Mr. Chang's honesty and integrity, despite their estrangement,
25
and offers as an explanation for this aberration that his cultural background and history permitted
26

1    him to rationalize his offense in the midst of his astronomical gambling losses:

2        In [the Chinese] community, many people believe that everyone hides money from the
         government and so they say it must be okay. Many people are also very suspicious of
3        government, more than American people. His family lost everything to the Chinese
         Government when they left Shanghai. I think he is trying to outsmart the Government.
4        His concept towards Government was twisted . He is not aware that it is different here,
         but he was not very good at opening up his mind.
5        Because Dominic is a very good person, he would never do something that he thought
         would hurt someone or if he thought it really was wrong.

6    Exh. B.  Bor Chan independently draws the same conclusion as to the impact of cultural factors

7    on Mr. Chang's decision to flout the tax laws in the years succeeding his divorce: "I have been

8    puzzled why an honest, caring man like Dominic would be involved in such a crime.  The only

9    thing that I can think of is that he was [brought] up in the Far East where people do not take

10   certain laws as seriously as they do here, especially tax laws.  I know he has learned much from

11   this experience, and know that he will never do anything like this again."  Exh. D.  The extent to

12   which Mr. Chang now appreciates the severity of his offense is evident in his "often[-]expressed

13   concern that he will die of old age without having fully satisfied that debt," and in his attempted

14   resort to his younger brother for a personal loan to assist in restitution, "unthinkable for the oldest

15   son in a traditional Chinese family."  Exh. A.

16       The extent to which Mr. Chang has addressed the gambling addiction that motivated his

17   offense is also a factor for the Court to consider.  He has demonstrated a desire and an ability to

18   arrest that behavior, abstaining for an extended period beginning in 2003, even before any

19   suggestion of an IRS audit.  Notwithstanding a relapse after the inception of the criminal case (at

20   much more modest levels than during the tax years at issue), Mr. Chang has refrained from

21   gambling of any sort since the Lunar New Year.  PSR ¶47; Exh. A.  His son writes:

22       Despite the force of his addiction, he's begun to understand what it is that draws him to
         gambling and how destructive it is for himself and his relationships.  For a long time, he
23       couldn't articulate what it was that he found so alluring.  When I'd try talking to him
         about it, he'd just brush me off by saying he needed to relax, as though gambling were
24       just a hobby.  This case has forced him to confront the worst that gambling has brought
         out in him, and to question why, and whether it was worth it in the end.  His ability to
25       describe how he feels at the casino – with the attention of the casino managers and the
         staff, and the temporary companionship of a lot of other Chinese men of a certain age –
26

1   gives me confidence that he can see through the superficial allure and move on to
    improving his life and meeting those needs in more constructive ways.

2   *Id.*  While it is clear that Mr. Chang will require mental health counseling to address the issues

3   that have driven his addiction, his acknowledgment of that addiction and the nature of

4   gambling's attraction for him represent meaningful progress.

5       Finally, also potentially relevant to this Court's sentencing decision is the impact of its

6   sentence on Mr. Chang's ability to be a contributing member of society.  Although his second

7   wife owns Dominic's Auto Service, she has lacks the mechanical background to manage the shop

8   and other employees without Mr. Chang's assistance.  Although the business might be able to

9   survive Mr. Chang's absence for a relatively brief period with the assistance of friends in the auto

10  repair industry who are indebted to Mr. Chang for their training and sponsorship in the United

11  States, their combined efforts cannot be expected to last more than a few months, given their own

12  obligations to their respective auto shops.  It is unclear how Mr. Chang would maintain a living if

13  the business were to fail, having little employment history other than self-employment, limited

14  though functional English fluency, and considerable and recent notoriety.

15                                  **CONCLUSION**

16      For the foregoing reasons, the defense respectfully requests that this Court impose a

17  sentence of probation, with an appropriate term of home confinement as well as mental health

18  counseling as a condition of Mr. Chang's probation supervision.

19
    Dated: May 7, 2008
20
                                    Respectfully submitted,
21
                                    BARRY J. PORTMAN
22                                  Federal Public Defender

23

24                                  s/
                                    CYNTHIA C. LIE
25                                  Assistant Federal Public Defender

26

Defendant's  Sentencing Memorandum
CR 07-00554 JF                              13