# JONATHAN K. CHANG

567 Warren St., Apt. 503
Brooklyn, NY 11217
home: (646) 862-4890 | cell: (510) 367-4478 | e-mail: jonchang@cal.berkeley.edu

May 5, 2008

The Honorable Jeremy Fogel
United States District Court
 for the Northern District of California
280 South 1st Street
San Jose, CA 95113

Re:    Dominic Chang

Dear Judge Fogel:

I write concerning my father, Dominic Chang, who is scheduled to be sentenced before Your Honor on July 9, 2008. As I reach the end of a district court clerkship, I have seen a number of criminal defendants come before the court for sentencing. I've read PSRs and sentencing memos, but I can't claim to have the same insight into the lives and circumstances of those individuals that I do with my father, or to be able to meaningfully or objectively compare their situations to his. All I can do is try to share what I know about him insofar as it may be relevant to your sentencing decision.

I first learned of my father's tax evasion at some point while he was being audited, before the matter was referred for criminal investigation. I was in law school across the country at NYU at the time, but we were in regular contact. He told me he was in trouble, and over the course of a few painful conversations, he told me everything. I know how much pride he's taken over the years in the progress of my legal education, training and employment. The same part of him that is proud of me and my sister makes it exceptionally hard for him to cope with the shame of having violated both the laws that his children have committed to uphold, and the standards of honesty and integrity that he worked so hard to instill in us. It was especially difficult for him to tell me about his tax evasion because I was working as an intern with the U.S. Attorney's Office in the Southern District of New York at that time and he knew that I had an interest in becoming a prosecutor in the future. His shame and fears for himself aside, he has been particularly concerned with the possible effect his conduct and conviction could have on the career prospects of my sister and myself.

My father has always been a very loving father. While his culture prevents him from expressing his feelings, his actions while I was growing up clearly conveyed his love. He has always worked six days a week, and, until his relationship with my mother became more troubled, he would always spend the seventh day with my mother, my sister and myself. A typical Sunday excursion would entail driving to San Francisco to have lunch in Chinatown, catching a movie at a Chinese movie theater or going to Fisherman's Wharf to fly a kite, and ending the day with shopping for Chinese delicacies. He has also always encouraged my sister and me to pursue our activities and interests. For example, even though he does not ski, he has spent many Sundays taking my sister and me to Tahoe -- he usually slept in the car until my sister and I were ready to go home. His encouragement and support played a large role in my academics as well. While I struggled with the decision between a career in medicine and one in law, my father offered me support and assurance: he consistently



encouraged me to pursue *my* interests, not those imposed by others, and assured me that he would stand behind my choices.

Aside from being a good father, my father is a generous and caring man. As the oldest son in a Chinese family, he seems to go through life more concerned for others than for himself. When I was growing up, he would often support causes such as Self-Help for the Elderly, an organization which helps Chinese-American senior citizens in the Bay Area, by making financial contributions and attending charitable events. To this day, he invariably offers customers his own car as a loaner, and if they refuse, a ride home or back to the office. He has also housed numerous relatives, friends and friends of friends at his home as they find their footing in the United States. In 1989, my father's close friend from their apprenticeship, Antonio, moved from Hong Kong to the Bay Area; not only did my father provide Antonio with housing and food for nearly a year as he waited for the rest of his family to join him, my father also gave him a job at his gas station. When Antonio's family arrived, my father helped Antonio's wife secure a job. This pattern occurred several times in my childhood and has not ceased. This past December, he was hosting a husband and wife from China who had recently obtained asylum; I asked how my father met the couple, and the answer was that they had met at a restaurant where the wife was working as a waitress. In addition to welcoming the two into his household, my father helped them learn to drive and enlisted me to help petition for the entry of their young child and elderly father.

While my father's giving nature is positive in many respects, I believe it is also partially responsible for his downfall. My mother's decision to divorce my father was very difficult for him on a number of levels. Financially, he went from operating a busy and centrally located Unocal station and auto shop to running a small stand-alone auto repair shop in an out-of-the way area of Milpitas. He went from a big house in Los Altos Hills to a tiny apartment in Milpitas and he could no longer afford to maintain the vintage Mercedes that he was once so proud of – he bought the car, a 380 SEL imported from Europe, brand new in 1984 and the car bore the license plate "CHANG 38," indicating his pride of being able to afford such a car at the age of 38. Emotionally, he was lonely and depressed. Not only did he lose my mother, but he also felt isolated from the circle of friends they once shared. When I visited him during weekends home from college, I noticed that he was associating more with culturally Chinese gambling associates, rather than the more Westernized friends that he and my mother had shared. With the divorce, my father developed a chip on his shoulder – he felt like he had to prove that he could do just as well, financially and in other respects, as he had during their marriage, and do better than my mother after the divorce. He wasn't obsessed with money per se, but he became preoccupied with what he saw as the inequities of life and class, and he began to equate money with happiness. He would have wanted to pay for the college education of my sister and myself in any case, but it became especially important for him to do it after the divorce, both as a way of meeting what he saw as his parental duty, as well as to give us the education that he was convinced would allow us to escape the difficulties that he'd faced along his way.

I lived with my father for about seven months after graduating from college in 2002, and it was then that I first began to realize the extent of the financial strain he'd been under. While his income had decreased, his generosity had not. He had still been providing my sister and myself with an upper-middle class lifestyle and always won the fight to pick up the tab when dining at Chinese restaurants with his friends.

When I was applying to law schools in the Fall of 2002, having already paid for my college education, my father made it clear that he wanted very much to help me with my law school expenses. Even as he urged me to accept his assistance, I could see his mounting anxiety about money matters, especially since my grandmother had just moved to the Bay Area to live with him. Seeing how he was living and knowing that he was still putting my sister through school, I couldn't accept. I could see in his face that he was both relieved by my refusal and ashamed of his relief.

As a result of either a cultural or familial trait, I'm not sure which, my father (unlike my mother) has always exhibited a tendency toward denial or avoidance of difficult or uncomfortable issues. I believe this tendency has contributed to my father's late acknowledgment that his gambling is an addiction, and to his reticence in confronting the emotional issues that drew him to gambling. Looking back, I realize that prior to my parents marital difficulties, my father's life consisted of work and family; however, when his relationship with my mother became strained, gambling became part of his life as a way, I believe, to avoid my mother and their relationship issues.

Notwithstanding the real difficulties that my father faced after the divorce, he now recognizes that he bears the ultimate responsibility for gambling away so much of what he was able to earn, and for responding to the ensuing money crunch the way that he did. When my father met Thanh Lam, my de facto stepmom, he stopped gambling. I know that she tried to help him with this by going with him to Gamblers Anonymous meetings. Not being one to talk freely about his feelings, especially among strangers, he came away from the experience feeling like he could quit on his own, and to his credit, he went for a long time without gambling. He started up again after he learned that he had been indicted in order to mute his anxiety, and partly out of a sense of fatalism about what would befall him. He stopped again after the Lunar New Year in February, albeit without the benefit of counseling, in an effort to start fresh, turning over a new leaf as it were.

Despite the force of his addiction, he's begun to understand what it is that draws him to gambling and how destructive it is for himself and his relationships. For a long time, he couldn't articulate what it was that he found so alluring. When I'd try talking to him about it, he'd just brush me off by saying he needed to relax, as though gambling were just a hobby. This case has forced him to confront the worst that gambling has brought out in him, and to question why, and whether it was worth it in the end. His ability to describe how he feels at the casino – with the attention of the casino managers and the staff, and the temporary companionship of a lot of other Chinese men of a certain age – gives me confidence that he can see through the superficial allure and move on to improving his life and meeting those needs in more constructive ways.

Irrespective of that progress, my father and I both understand that an important component of sentencing is punishment, not just rehabilitation. I will not presume to suggest how much punishment is appropriate in my father's case, but the extent to which he has already suffered in the course of the prosecution may be relevant to your decision. I expect that every person charged with a criminal offense experiences an uncomfortable level of stress, especially when facing the prospect of imprisonment. What my father experiences seems more extreme. The most vivid example of this is a breakdown he had about two

years ago, at about the time he started meeting with the investigating agent. He told me he was afraid that his life was over, that he'd have no family or friends because everyone he knew, including his family, would be ashamed of him. For a proud man who is accustomed to being admired, like my father, the shame of being convicted of a federal crime felt like too much for him to handle.

My father's feeling of shame has affected relationships with those closest to him. His relationship with my grandmother has deteriorated to the point that they no longer talk about anything substantive because, I believe, he is afraid that she is ashamed of him. He used to call me at least once a week and we could talk about anything at all. Now, he almost never calls, and when he does, we rarely talk as we used to: he's very moody, depressed and fatalistic about life in general and about his prospects after he serves his sentence. As an example of his fatalism, last fall he told me that he wished he could begin serving his sentence immediately because he felt as if he would be just as well off in prison. More than once over the duration of the civil audit and eventual criminal prosecution, he has told me that he wished there would be some resolution so that he can just know that his life as he's known it is effectively over.

My father's stress increases every time a new development occurs in his case — whether it was a request for documents during the audit phase, or the filing of the indictment. Thanh tells me that as a result of these events, she is frequently awakened by him sobbing in the middle of the night. Until this case, I had known my father to have cried twice in his adult life: first, when he sat me and my sister down to tell us that he and my mother were getting a divorce, and then at the funeral of his nephew, who died of cancer at the age of 21.

Despite this emotional toll and his pessimism about what will befall him after serving his sentence, I have been encouraged by my father's continuing efforts to gain insight into his addiction and his emotional baggage, even though his struggle in that regard promises to be a long one. After the commencement of the criminal investigation, my father has not wavered in his acceptance of responsibility for his crime. He takes his obligation to repay his taxes seriously: he has often expressed concern that he will die of old age without having fully satisfied that debt, and he has done the unthinkable for the oldest son in a traditional Chinese family — turning to his younger brother, my Uncle Tony in Singapore, about trying to borrow money from him for that purpose. At the time of his breakdown two years ago, I was briefly afraid that he might consider fleeing the United States. The fact that he chose not only to remain, but to confess to the IRS, plead guilty and face his just punishment makes me regret that fleeting doubt.

Thank you for your patience in making your way through this long letter. I know that many cases require your attention, and hope that some part of what I've written conveys why this one means so much to me.

Very truly yours,

Jonathan Chang