1   BARRY J. PORTMAN
    Federal Public Defender
2   CYNTHIA C. LIE
    Assistant Federal Public Defender
3   160 West Santa Clara Street, Suite 575
    San Jose, CA 95113
4   Telephone: (408) 291-7753

5   Counsel for Defendant CHANG

6

7

8                   IN THE UNITED STATES DISTRICT COURT

9              FOR THE NORTHERN DISTRICT OF CALIFORNIA

10  UNITED STATES OF AMERICA,          )   No. CR-07-00554 JF
                                       )
11                  Plaintiff,         )   DEFENDANT'S RESPONSE TO
                                       )   GOVERNMENT'S SENTENCING
12  vs.                                )   MEMORANDA
                                       )
13  DOMINIC CHANG,                     )
                                       )
14                  Defendant.         )
    _____)

15

16                          **INTRODUCTION**

17         The government's argument for a sentence of imprisonment is based on an outdated

18  vision of the Sentencing Guidelines, and on an unsubstantiated speculation that Mr. Chang has in

19  some way compounded his tax evasion through a surmised concealment of assets and income

20  beyond the charged offenses, an allegation that even the government's own investigating agent

21  has characterized as obviously problematic.  Although the government's suspicions of Mr. Chang

22  and its nostalgia for an era before *Booker* may be predictable, even on some level understandable,

23  its contentions are incorrect.  In view of Mr. Chang's background and history and the nature and

24  circumstances of the offense, a sentence of probation and home confinement is sufficient and no

25  greater than necessary to achieve the multifaceted objectives of sentencing.

26

**ARGUMENT**

**I.     The Doctrinal Arguments Advanced by the Government Have Been Rejected by the Supreme Court and Ninth Circuit**

The government relies largely upon pre-*Booker* authorities that treated the Guidelines as mandatory and restricted variances from the Guidelines to enumerated "departure" grounds, notwithstanding the federal courts' now-unanimous agreement that such a restrictive interpretation violates the Sixth Amendment.  It similarly relies on out-of-circuit decisions rendered in the interval between *Booker* and *Rita*, *Gall* and *Kimbrough*, out-of-circuit decisions wholly discredited by those later rulings of the Supreme Court.  Although the government's arguments might have been doctrinally sound at the time that the matter was first transferred from the civil division for criminal investigation, the passage of years during the criminal investigation has not only witnessed Mr. Chang's extensive cooperation in meetings with criminal investigators, despite the correspondingly prolonged emotional distress documented in the defense sentencing memorandum filed May 7, 2008, but have also permitted the Supreme Court to further clarify the import of its Sixth Amendment decision in *Booker* and its progeny.

The government fails to respond to or even to acknowledge the Supreme Court's decisions in *Gall*, *Rita* and *Kimbrough*.  The government's reliance upon *United States v. Ture*, 450 F.3d 352 (8th Cir. 2006), is particularly misplaced.  The Eighth Circuit decided *Ture* at a time when Eight Circuit precedent required its district courts to presume that a sentence within the guideline range was reasonable. *See, e.g., United States v. Gall*, 446 F.3d 884, 889 (8th Cir. 2006).  Notably,  the Eighth Circuit even prior to the Supreme Court's reversal of *United States v. Gall* had taken pains to limit the scope of *Ture*:

> Although all of these cases involved the reversal of downward variances that had resulted in probation when the Guidelines had called for imprisonment, they do not stand for a blanket rule that all such variances are unreasonable.  Such a rule would amount to the judicial elimination of a sentencing option that would otherwise be available under federal criminal statutes that do not impose mandatory imprisonment, including the statute at issue in this case.  This judicial rule would effectively require imprisonment for defendants whose offense level falls within Zone B or above within the sentencing table

1    of the Guidelines.  That kind of categorical, mandatory approach to sentencing on the
2    basis of judicially-found facts is precisely the type of sentencing regime the Supreme
     Court rejected in Booker.

3    *United States v. Wadena*, 470 F.3d 735, 738 (8th Cir. 2006) (distinguishing *Ture* and affirming

4    district court's sentence of probation, in lieu of guideline sentence of 18 to 24 months); *see also*,

5    *United States v. Meyer*, 452 F.3d 998, 1000 n.3 (8th Cir. 2006) (author of panel opinion, in a

6    separate footnote, citing *Ture* and other decisions as evidence that the Eight Circuit post-*Booker*

7    was failing to modulate its approach to sentencing in accordance with that Supreme Court

8    decision).  The Eighth Circuit rule that district courts must treat the guidelines range as

9    presumptively reasonable was expressly rejected in the Supreme Court's unambiguous reversal

10   of the Eighth Circuit in *Gall v. United States*, 128 S.Ct. 586 (2007).  Accordingly, after that

11   decision of the Supreme Court, the district court in *Ture* imposed the identical sentence that the

12   appellate court had earlier reversed, a sentence significantly less onerous that recommended by

13   the Probation Office in the instant case:  probation for a term of two years, no period of

14   confinement, and 300 hours of community service, notwithstanding a tax loss of $240,252

15   (approximately 50 percent greater than the tax loss in the instant case).  Exh. I.  The interest

16   noted by the government in avoiding sentencing disparity would appear to support the Probation

17   Office's recommendation, or even a lesser sentence, in view of Mr. Chang's age, mental and

18   physical health, and tax loss as compared with Mr. Ture's.

19       The government also cites *United States v. Burgos*, 276 F.3d 1284, 1290 (11th Cir. 2001)

20   for the proposition that "[f]or a judge sentencing a defendant convicted of tax evasion, the chief

21   concern may be general deterrence."  Leaving aside the pre-*Booker*, pre-*Blakely* publication of

22   *Burgos*, the unexpurgated whole of the footnote from which this dictum is excerpted is more

23   nuanced than the inference the government invites:

24       Obviously, a judge may give one goal more weight than others in a particular case. For
         example, a judge may consider punishment the primary goal for a defendant convicted of
25       homicide; whereas, specific deterrence may be the goal heavily weighted in fashioning a
         sentence for a recidivist. For a judge sentencing a defendant convicted of tax evasion, the
26

1    chief concern may be general deterrence, and, if sentencing a defendant who is a one-time
     offender, a judge may avoid incarceration and focus on rehabilitative programs. Further,
2    we have explained elsewhere that, "for purposes of determining the need for
     incarceration, Congress specified that only the first three goals, punishment, general
3    deterrence, and specific deterrence, could be considered." *See, e.g.*, *United States v.
     Roman*, 989 F.2d 1117, 1122 n.9 (11th Cir. 1993) (Tjoflat, C.J., specially concurring)
4    (emphasis added); *see also United States v. Scroggins*, 880 F.2d 1204, 1208 (11th Cir.
     1989). While Congress prohibited incarcerating an offender for purposes of rehabilitation,
5    *see United States v. Dunnigan*, 507 U.S. 87, 97, 113 S. Ct. 1111, 1118, 122 L. Ed. 2d 445
     (1993), an offender's need for rehabilitation may be considered in prescribing the
6    conditions of probation or supervised release. *Scroggins*, 880 F.2d at 1208 n.10 (citing 18
     U.S.C.A. § 3563(b)).

7

8    *Id.*, n. 6.  Taken in context, the 11th Circuit in *Burgos* was not announcing or even proposing a

9    general rule that district judges should consider general deterrence as the preeminent concern in

10   all tax evasion cases; rather it was merely providing possible illustrations of the different ways in

11   which district judges might exercise their discretion in different individual cases, without

12   suggesting the rigid approach advanced by the government here.  Moreover, to the extent that the

13   government urges this Court to make an example of Mr. Chang on the theory that general

14   deterrence is the most important 3553(a) factor, the Supreme Court has declined to privilege any

15   one of the 3553(a) factors over any other, and the Ninth Circuit has unambiguously held that no

16   factor is entitled to greater weight than the others.  *United States v. Carty*, – F.3d –, 2008 WL

17   763770 (9th Cir. Mar. 24, 2008) (en banc) at *4 (no single factor identified in § 3553(a) is

18   entitled to greater weight than any other).  Mr. Chang is no Wesley Snipes;  to the extent that he

19   has become a public figure, he owes this standing exclusively to the government's tactical

20   deployment of press releases.  He should not now be punished more harshly because of the

21   government's election to make him the current face of tax evasion in the local Chinese American

22   community.

23   **II.    The Government Has Substantially Misconstrued the Nature of Mr. Chang's Post-
             Offense Conduct and Statements**

24          Much like its revanchist gloss on the applicable law, the government's interpretation of

25   Mr. Chang's post-offense personal and business dealings lacks merit.  The government points to

26

1   Mr. Chang's initial denial of guilt and his transfer of his business to Thanh Lam as aggravating

2   factors, whereas both, upon more careful examination, are of doubtful relevance, especially in

3   light of the evidence, set forth more fully in the Defendant's Sentencing Memorandum filed May

4   7, 2008, from Mr. Chang's friends and family of the profound effect that this prosecution has had

5   upon him and of the particular circumstances that contributed to his commission of the offense.

6         Mr. Chang does not dispute that he denied guilt during the IRS' civil audit.  It should be

7   noted, as a threshold matter, that Mr. Chang's initial denial of guilt does not materially

8   distinguish him from the vast majority of criminal tax evasion defendants.  Indeed, both counsel

9   for the government and Special Agent Bailie have separately commented to the undersigned that,

10  but for the false denial of guilt, Mr. Chang would not have been prosecuted criminally.  As to the

11  government's contention that Mr. Chang continued to deny his guilt during the criminal

12  investigation, the statements that the government characterizes as untruthful are (1) Mr. Chang's

13  statement to investigating agents that he had been unaware that his Wells Fargo account was still

14  open after his previous gas station business shut down, and (2) his statement that he was unsure

15  whether he provided his tax preparer with his Wells Fargo bank statements.  As a threshold

16  matter, it should be noted that although Mr. Chang has a functional command of the English

17  language, he has twice failed to demonstrate the level of fluency deemed necessary to run a gas

18  station franchise.  Exh. B.  Assuming that his lack of fluency did not in any way limit his grasp of

19  either the import of a particular question or the time frame to which a particular question

20  pertained, these two statements at the outset of the criminal investigation are vastly outweighed

21  by the extent and duration of his purely voluntary cooperation both in the initial interview and in

22  several additional meetings over the ensuing year.  Agent Bailie in his report makes clear that

23  Mr. Chang admitted his tax evasion in their first meeting and subsequently met with the agent on

24  several occasions outside the presence of his then-counsel in order to cooperate in the

25  investigation, that Mr. Chang disclosed to the best of his ability every business-related deposit

26

Defendant's Response to Government's
Sentencing Memoranda
CR 07-00554 JF                                    5

1    that he had previously concealed in his original tax filings, and that in subsequent tax returns,

2    Mr. Chang reported no business expenses or nontaxable transactions, to his detriment.

3          Although the government's suspicions are understandable in view of the tax evasion to

4    which Mr. Chang has confessed, the government has not considered the practical and legal

5    necessity for the transfer of ownership.  As a result of his mounting debt and ensuing business

6    troubles, Mr. Chang had obtained $15,000 in financial assistance from his girlfriend, Thanh Lam,

7    in February 2004, prior to their short-lived marriage.  PSR ¶60.  That amount exceeded not only

8    the depreciated value of the new and used equipment which Mr. Chang purchased to establish the

9    business before the couple met, but also the purchase price and replacement value of those assets.

10   PSR 60; Exh. H.  The $15,000 enabled Mr. Chang to pay off a fraction of his delinquent

11   accounts, but did nothing to rehabilitate Mr. Chang's by-then nonexistent credit rating or to

12   enable the business in continuing to operate.  To protect herself and her investment, Ms. Lam, a

13   bookkeeper by training, became a partner in the business and assumed full-time stewardship of

14   the business accounts and bookkeeping upon the couple's marriage in 2004.[1]  As a co-owner, Ms.

15   Lam, like Ms. Wu had been before her, was essential to Mr. Chang's ability to remain in business

16   during their marriage.  When the couple decided to divorce, Ms. Lam became the sole owner of

17   the business, because Mr. Chang no longer had the credit necessary to run the business or the

18   resources to buy her out, and because the City of Milpitas had restricted their ability to transfer

19   the business license to a third party, whereas dropping Mr. Chang as co-owner remained

20   _____

21          [1]The couple recalls applying to add Ms. Lam to the Milpitas business license on or about
     their marriage in 2004.  The City of Milpitas issued a business license tax receipt to the couple as
22   co-owners of the business, in July 1, 2005, but because of the anticipated divorce settlement, Mr.
     Chang's name was deleted  from the license and an amended receipt was issued for July 1, 2005,
23   this one solely in Ms. Lam's name.  Since that time, the business license has remained in Ms.
     Lam's name exclusively, although the name of the business continues to reflect Mr. Chang's
24   given name in an effort to retain what remains of his customer base.  Exh. G.  Accordingly, the
     government's contentions that Mr. Chang is defrauding the City of Milpitas by maintaining the
25   business license in his own name and that the City of Milpitas prohibited the addition of Ms.
     Lam to the business license, are in error.
26

     Defendant's Response to Government's
     Sentencing Memoranda
     CR 07-00554 JF                                   6

1   permissible.  Exh. H.

2      Beyond Ms. Lam's investment of time and money in the business, she has put significant

3   effort into assisting in Mr. Chang's rehabilitation.  Mr. Chang disclosed in the presentence

4   investigation that Ms. Lam personally escorted him to Gamblers' Anonymous meetings, in an

5   effort to address what she recognized was the root cause of his financial troubles.  Mr. Chang's

6   daughter Jennifer reports that Ms. Lam has kept the business accounts under her sole control and

7   has specifically counseled his children against helping him to open personal credit card accounts

8   with them (Mr. Chang and Ms. Lam independently confirmed this report). Ms. Lam moreover

9   has lived with Mr. Chang throughout the duration of the criminal investigation and has witnessed

10   the extent of the emotional toll Mr. Chang has experienced as a result of his tax evasion and

11   prosecution.  PSR ¶48.

12      The government has invited this Court to speculate that Ms. Lam, the person who has

13   demonstrated a commendable degree of watchful supervision in anticipating and guarding

14   against Mr. Chang's known vulnerabilities, is engaged with him in a continuing fraud on the IRS,

15   despite the IRS' express warnings to her of its continuing scrutiny of the business.  This

16   speculation is without evidentiary or logical foundation.  The government asserts that the

17   consideration for the 2005 transfer was inadequate, but it has failed to identify a basis for this

18   conclusion, other than the volume of gross receipts for the 1999-2001 tax years,[2] well before Mr.

19   Chang's damaged credit impaired his ability to run the business independently, before the

20   notoriety that the government's publication of his tax evasion conferred upon him, and before the

21   clientele he had built at the Chevron and Unocal stations during his first marriage had diminished

22

23      [2]The estimate of gross receipts for 1999-2001 was based upon Mr. Chang's dogged post-

24   confession efforts in 2006-2007 to cooperate with the criminal investigation by guessing, with
minimal documentation, which bank deposits were business revenues, rather than nontaxable

25   transactions.  While the defense does not proffer an alternate revenue or tax loss estimate, it
respectfully submits that the reliability of the government's methodology is open to question

26

Defendant's Response to Government's
Sentencing Memoranda
CR 07-00554 JF     7

1  in proportion to the relative inconvenience of his newer, less central and more obscure location

2  and his absences from the shop during prolonged gambling binges. PSR ¶9. Implicit in the

3  government's reliance on the 1999-2001 gross receipts are the questionable assumptions (1) that

4  the business today is as active it was in 1999 despite the notoriety the government has visited

5  upon Mr. Chang through its media relations, (2) that Mr. Chang's credit history and bankruptcy

6  have had no lingering impact on its access to vendors, the speed with which it can obtain

7  necessary parts for repairs and corresponding customer satisfaction, and (3) that the survival of

8  the business owes nothing to the labor and stewardship of Ms. Lam.[3]  The defense has identified

9  for the Probation Office the business' tangible assets, in an inventory of its non-leased

10  equipment, as well as pricing information for the same or comparable items;  the government has

11  failed to respond to a defense discovery request dated April 18, 2008 for any corresponding

12  inventory of equipment produced by the IRS during the civil examination and its many visits to

13  the business.  The adverse inference sought to be drawn by the government also flies in the face

14  of the compelling testimonials offered by Mr. Chang's friends, family and long-time customers

15  as to his exemplary character and the unique combination of circumstances that led him to

16  commit the highly uncharacteristic instant offenses.

17      The tax returns Mr. Chang filed for 2002 and 2003 also belie the government's

18  unsubstantiated charge that he is continuing to evade his tax obligation.  According to the report

19  of Agent Bailie furnished by the government to the Probation Office:

20      The 2002 and 2003 returns referenced in the Referral were prepared by James Sullivan
        after the civil examination began.  Mr. Sullivan told the investigating agent that he
21      arrived at the income figures on these unsigned returns by simply totaling all deposits into
        Chang's bank accounts without accounting for transfers or nontaxable items.  Chang's

22

23
        [3]On an unannounced visit to the shop by the undersigned, Ms. Lam was at work in the
24  shop's makeshift office in sweltering heat on an unannounced afternoon visit to the shop by the
    undersigned.  Mr. Chang and one assistant were the only others present. Ms. Lam reports several
25  years of full-time employment as a bookkeeper prior to a leave of absence and resignation upon
    her mother's death in 2003.
26

1   refusal to sign the returns under these circumstances can hardly be considered an
    indication of fraud.  With regard to Chang's original failure to file his 2002 and 2003
2   returns (i.e., before the civil examination commenced), his return preparer admits that he
    received, but never looked at the materials which Chang provided to him to prepare those
3   returns.  This would seem to present obvious complications with proving criminal intent
    or willfulness in an evasion charge.  Consequently, it was decided that the criminal
4   investigation would be limited to the 1999, 2000, and 2001 tax years.

5   Mr. Chang's conclusion that the 2002 and 2003 returns overstated his tax obligation was, as

6   Agent Bailie acknowledges, correct.  Nonetheless, he duly filed those returns, albeit unsigned, to

7   the IRS.  In addition, his effort to persuade his younger brother to lend him money to satisfy his

8   tax obligation, together with his often-expressed concern that he may die without having paid his

9   debt in full, indicate the seriousness with which he views his continuing duty to pay.  Exh. A.

10  That he has candidly admitted his desire to prevent Ms. Lam from paying with her labor and

11  investment in the business for crimes he had committed before they ever met, does not diminish

12  his acceptance of that obligation.

13                              **CONCLUSION**

14          For the foregoing reasons, the defense respectfully requests that this Court impose a

15  sentence of probation, with an appropriate term of home confinement as well as mental health

16  counseling as a condition of Mr. Chang's probation supervision.

17
    Dated: May 16, 2008
18
                                        Respectfully submitted,
19
                                        BARRY J. PORTMAN
20                                      Federal Public Defender

21

22                                      s/
                                        CYNTHIA C. LIE
23                                      Assistant Federal Public Defender

24

25

26
    Defendant's Response to Government's
    Sentencing Memoranda
    CR 07-00554 JF                              9